Rel: October 24, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

————————————————

### CL-2025-0151

————————————————

### Neal G. Whatley

### v.

### Allison H. Whatley

**Appeal from Montgomery Circuit Court**
**(DR-21-900613.02)**

————————————————

### CL-2025-0271

————————————————

### Neal G. Whatley

### v.

### Allison H. Whatley

**Appeal from Montgomery Circuit Court**
**(DR-21-900613)**

MOORE, Presiding Judge.

In appeal number CL-2025-0271, Neal G. Whatley ("the husband") appeals from a judgment entered by the Montgomery Circuit Court ("the trial court") in case number DR-21-900613 ("the divorce action") divorcing him from Allison H. Whatley ("the wife") to the extent that the judgment divides the marital property and awards alimony to the wife. In appeal number CL-2025-0151, the husband appeals from a judgment, entered in case number DR-21-900613.02 ("the modification action"), denying the husband's petition to modify his child-support obligation to the wife. We affirm in part and reverse in part the judgment entered in the divorce action. We affirm the judgment entered in the modification action.

Background Regarding Divorce Action

The parties have previously appeared before this court. See Whatley v. Whatley, 414 So. 3d 141 (Ala. Civ. App. 2024). This court entered an order incorporating the record on appeal from Whatley into the present appeals.

On October 27, 2021, the husband filed a complaint seeking a divorce from the wife. He asserted, among other things, that the parties

2

were married on April 21, 2018, and that there had been one child born of the marriage ("the child") on February 5, 2019. The husband requested, among other things, an award of joint legal and joint physical custody of the child, the award of certain real and personal property, and an equitable division of the parties' marital and individual debts. On November 22, 2021, the wife filed an answer to the divorce complaint in which she requested an award of sole physical custody of the child. On January 10, 2022, the wife filed an amended answer and a counterclaim for a divorce in which she asserted, among other things, that the husband had committed adultery and had impregnated another woman during the parties' marriage; she requested, among other things, sole physical custody of the child, an award of child support, an equitable division of the parties' real and personal property and debts, awards of alimony in gross and periodic alimony, and an award of attorney's fees.

During the pendency of the divorce proceedings, the wife filed multiple motions in which she asserted that the husband had failed to respond to her requests for discovery. The trial court entered orders directing the husband to respond to the wife's discovery requests, and, on August 16, 2022, the trial court entered an order finding the husband in

3

contempt of those orders and again directing the husband to comply with all outstanding discovery requests. On December 8, 2022, the wife filed a motion for sanctions and to compel discovery responses in which she asserted that the husband had continued to refuse to comply with her discovery requests and the trial court's orders related to discovery; on March 9, 2023, she filed a motion requesting an expedited hearing on that motion and seeking to compel discovery or to continue the trial. On April 4, 2023, the trial court entered an order directing that the wife's motion would be heard on April 17, 2023, the day the case was scheduled for trial, and directing the husband to be prepared to show cause as to why he should not be held in contempt. On April 17, 2023, the case was called for trial; the trial court first heard testimony and arguments related to the wife's December 8, 2022, motion for sanctions before proceeding to the merits of the divorce action. The trial resumed on April 19, 2023, after which the husband filed, on April 27, 2023, his first amended complaint in which he sought to include adultery by the wife as an additional ground for the divorce. The trial concluded on May 2, 2023.

On August 28, 2023, the trial court entered a final judgment divorcing the parties ("the divorce judgment") on the ground of the

4

parties' incompatibility. The trial court awarded the parties joint legal and joint physical custody of the child, with the parties to exchange physical custody on an alternating weekly basis. The trial court directed the husband to pay all expenses for medical, dental, ophthalmological, orthodontic, counseling, and other related expenses incurred by the child not covered by insurance and to pay child support to the wife in the amount of $2,992 per month. The divorce judgment also awarded the husband the marital residence and made him responsible for payment of the outstanding mortgage indebtedness on that residence. Regarding alimony and the division of property, the divorce judgment provided, in pertinent part:

"14. The wife is awarded periodic alimony in the amount of $3,500 per month for four years (48 months). Alimony will commence on September 01, 2023, and shall be due and payable on the first (1st) day of each month thereafter, until August 01, 2027.

"15. The Court finds from the most recent Financial Statement signed by the husband and submitted as Husband's Exhibit 5, the husband's net worth as of May 31, 2023, was $8,889,930.00. The Court further finds that between the time the parties married in April 2018 to October 25, 2021, based on Husband's Exhibit 8, the husband had accumulated a net worth of $2,123,153.00. There was no reported Financial Statement or evidence as to any net worth of either the husband or the wife prior to 2019 or the date of marriage. The wife suggested in her testimony, which was

not disputed, that the parties initially lived 'from check to check.'  The husband filed for divorce in October 2021, and based on the testimony, the parties remained together a few months after the divorce was filed.  The wife was a stay at home mom, and was the primary caretaker of the child, N.G.W., who was born on February 02, 2019.  The wife also suggested she assisted to some degree with the husband's businesses such as investments advice, viewing perspective properties, and monitoring the radio traffic for the trucking business.  While the wife cared for the child and the home, the husband built his various businesses and accumulated the wealth referenced herein.  The husband accumulated a net worth [of] $2,123,153.00 while the parties were living together as husband and wife through October 2021.  The wife is therefore awarded 50% or $1,061,577.00 of the said accumulated net worth as of October 25, 2021. The husband accumulated an additional net worth of approximately $6,766,777.00 between November 2021 and May 2022.  It appears from the testimony, that the parties were still living as husband and wife for a period of approximately three months during this period, and the wife remained a stay at home mom and the primary caretaker of the minor child for this entire period.  The wife is therefore awarded 20% of the said additional net worth of $6,766,77.00 accumulated during the said period or $1,353,355.00.  The net worth includes the marital home and any associated equity therein.  The wife's share of the said net worth accumulated during the marriage is approximately 27% and the husband's share is approximately 73%.  The court finds the said property division to be fair and equitable.

"16. The payment of the said $2,414,932.00 shall be paid by the husband to the wife over a period of forty-eight (48) months.  The husband shall pay equal monthly payments to the wife in the amount of $50,311.08, commencing on October 01, 2023, and continuing on the first day of each month thereafter until September 01, 2027."

6

In addition to those awards, the divorce judgment awarded the wife certain personal property; banking and investment accounts in her individual name; any retirement benefits that she had accumulated; and a 2020 Chevy Tahoe or any vehicle currently in her possession, with the husband to pay any indebtedness owed thereon and the wife to be responsible for insurance, repairs, and maintenance expenses associated with that vehicle. The husband was awarded all items of personal property that he had owned before the marriage, had been inherited by him, or had been given to him, and his personal items and belongings; the balances in the banking and/or investment accounts held in his individual name; all right, title, and interest in any businesses, holdings, or partnerships owned by him that were not otherwise awarded, including a house in Santa Rosa Beach, Florida; any retirement benefits accumulated by him through his current or previous employments; the items of personal property presently in his possession; and any vehicle currently in his possession, with the husband to be solely responsible for any and all indebtedness thereon. The trial court ordered the wife to be responsible for all existing debts that had been incurred by her, except

for those debts that were specifically listed and were to be paid for by the husband.

Regarding the wife's contempt motion, the divorce judgment provides:

> "24. The court finds the husband's conduct and repeated violation of the court's orders to be blatant. It was quite clear to the court that the husband had every intent to hide or otherwise secret his assets from the wife and this court, thus failing to comply with discovery request[s] and this court's orders compelling him to do so. The husband is found in contempt of this court's order of August 16, 2022, which further compelled him to comply with any and all outstanding discovery request[s] and which imposed a $100.00 daily fine for his failure to comply. As of the date of the hearing herein, nine months later, the husband had still not complied with the court's order. He had failed to comply for approximately 250 days, causing the wife to expend time and money to obtain the requested information on her own, although he had the ability to provide such information."

The trial court fined the husband $5,000 for the more than 50 days that he continuously failed to comply with the trial court's orders and directed the husband to pay that amount to the clerk of the court within 30 days; awarded the wife $100,000 in attorney's fees; and entered a judgment against the husband and in favor of the wife in the amount of $17,190 for expert-witness services.

On September 27, 2023, the husband filed a motion to alter, amend, or vacate the divorce judgment. Following a hearing, the trial court entered an order on December 18, 2023, granting the motion, in part. Specifically, the trial court amended paragraph 14 of the divorce judgment to state:

> "The wife is awarded periodic alimony in the amount of $3,500.00 per month for three years (36 months). Alimony will commence on September 01, 2023, and shall be due and payable on the first (1st) day of each month thereafter, until August 1, 2026. The court finds that the wife's current estate is insufficient and does not allow her to preserve or continue in the economic status she enjoyed during the marriage. The husband has the demonstrated ability to provide the said support without undue hardship, and the said award is equitable under the facts and circumstances of this divorce."

Additionally, the trial court amended paragraph 16 to direct the husband to pay the $2,414,932 awarded to the wife over a period of 60 months in equal payments of $40,248.86. The trial court denied all remaining relief requested.

On December 22, 2023, the husband filed a notice of appeal to this court. In Whatley, this court reversed the divorce judgment and remanded the case for the trial court to enter a new judgment clarifying whether it had intended to award the wife rehabilitative alimony or periodic alimony, in accordance with Ala. Code 1975, § 30-2-57.

9

The Divorce Action Following Remand

On October 16, 2024, this court entered a certificate of judgment in Whatley, ordering that the costs of the appeal were to be "taxed against the appellee(s) as provided by Rule 35, Ala. R. App. P." On October 23, 2024, the husband filed a motion in the trial court requesting an order taxing the costs of the appeal in Whatley to the wife in the amount of $4,636.50, representing amounts incurred for the payment of this court's docket fee and the costs of producing the necessary copies of the clerk's record and the reporter's transcript in Whatley. He attached exhibits to his motion in support of the amounts requested. On November 11, 2024, the wife filed an objection to the husband's motion. On March 19, 2025, the wife filed a motion requesting the entry of a judgment in accordance with this court's opinion in Whatley. On March 28, 2025, the trial court entered a judgment ("the final judgment") amending paragraph 14 of the divorce judgment to state:

> "The [w]ife is awarded rehabilitative alimony in the amount of $3,500.00 per month for three years (36 months), beginning on September 1, 2023, and shall be due and payable on the first (1st) day of each month thereafter, until August 1, 2026. The Court finds that the [w]ife's current estate is insufficient and does not allow her to preserve or continue in the economic status she enjoyed during the marriage. The [h]usband has demonstrated ability to provide the said support without

10

undue hardship, and the said award is equitable under the facts and circumstances of this divorce. Particularly, the Court notes the [h]usband spent lavishly on his paramour at the time of filing for divorce and continuing throughout the divorce proceedings. Testimony and evidence submitted to the Court indicated the [h]usband earns substantial income, whether said income was reported on [the] [h]usband's CS-41 form, or not. Given [the] [h]usband's business ownership and industry experience, the Court finds the [h]usband possesses substantial future earning capacity. The [w]ife stayed at home, by agreement of the parties, during the marriage to raise the parties' minor child. Moreover, trial testimony suggested that [the] [w]ife's long-term financial independence and future earning ability were uncertain due to [the] [w]ife's lingering medical issues. Testimony also suggested that [the] [h]usband's ability to earn more than the [w]ife weighed in favor of awarding rehabilitative alimony. The [h]usband was awarded the marital home and a second residence in Santa Rosa Beach, Florida that he purchased shortly after filing for divorce for his paramour to reside in. The [h]usband was awarded all commercial real estate and income producing real estate. The [h]usband was awarded all business interests, investment accounts, retirement accounts, checking accounts, savings accounts and all other investments. While the [w]ife was awarded a property settlement for her interest in the assets of the marriage. The [w]ife was awarded her vehicle, her personal belongings, and furniture in her possession. Thus, the Court finds … rehabilitative alimony to be warranted and appropriate under the circumstances of this matter."

The trial court directed that all other terms and conditions of the divorce judgment and the December 18, 2023, postjudgment order amending the divorce judgment not otherwise amended or corrected were to remain in full force and effect. It directed also that all other requested relief not

11

specifically addressed was denied.  On April 14, 2025, the husband filed a notice of appeal to this court.  On April 25, 2025, this court entered an order consolidating the husband's appeal in the divorce action with his appeal in the modification action, which is discussed in more detail, infra.

### Appeal No. CL-2025-0271

### Standard of Review

> "The issues of property division and alimony are interrelated, and, therefore, they must be considered together on appeal.  Albertson v. Albertson, 678 So. 2d 118, 120 (Ala. Civ. App. 1996).  When the trial court fashions a property division following the presentation of ore tenus evidence, its judgment as to that evidence is presumed correct on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that its decision is plainly and palpably wrong.  Roberts v. Roberts, 802 So. 2d 230, 235 (Ala. Civ. App. 2001); Parrish v. Parrish, 617 So. 2d 1036, 1038 (Ala. Civ. App. 1993); and Hall v. Mazzone, 486 So. 2d 408, 410 (Ala. 1986).  A property division is required to be equitable, not equal, and a determination of what is equitable rests within the broad discretion of the trial court.  Parrish, 617 So. 2d at 1038.  In fashioning a property division and an award of alimony, the trial court must consider factors such as the earning capacities of the parties; their future prospects; their ages, health, and station in life; the length of the parties' marriage; and the source, value, and type of marital property. Robinson v. Robinson, 795 So. 2d 729, 734 (Ala. Civ. App. 2001)."

Stone v. Stone, 26 So. 3d 1232, 1236 (Ala. Civ. App. 2009).

### Discussion

12

The Valuation Date for the Marital Estate

The husband first argues that the trial court erred in determining the valuation date for the marital estate. Specifically, he asserts that the trial court erred in awarding the wife a property settlement that included amounts earned by the husband after he filed his complaint for a divorce. Section 30-2-51(b)(1), Ala. Code 1975, provides:

> "The marital estate is subject to equitable division and distribution. Unless the parties agree otherwise, and except as otherwise provided by federal or state law, the marital estate includes any interest, whether vested or unvested, either spouse has acquired, received, accumulated, or earned during the marriage in any and all individual, joint, or group retirement benefits including, but not limited to, any retirement plans, retirement accounts, pensions, profit-sharing plans, savings plans, annuities, or other similar benefit plans from any kind of employment, including, but not limited to, self employment, public or private employment, and military employment."

The Alabama Comment to § 30-2-51 states, in pertinent part, that "[t]he statute intentionally fails to define the term 'during the marriage,' leaving it to the court to decide based on the evidence and equitable considerations the appropriate starting and ending date of the marriage for all purposes under the statute." The husband asserts that Alabama law provides little guidance on what factors a trial court should consider in determining the starting and ending date of a marriage for purposes

13

of valuing the marital estate; he cites cases from other jurisdictions and urges this court to adopt approaches applied by those jurisdictions to provide guidance on the proper date for the valuation of marital assets, particularly regarding the appreciation of the value of a marital asset following the filing of a complaint for a divorce. Although the husband failed to present those arguments and various approaches to the trial court for its consideration, see Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala. 1992), we note that, in his analysis of each of the approaches employed in other jurisdictions on appeal, the husband challenges the findings relied on by the trial court in fashioning its property division, as he did in his postjudgment motion. Accordingly, we proceed to consider the husband's challenges to the sufficiency of the evidence in support of the final judgment on this issue.

The husband argues that the trial court abused its discretion in awarding the wife amounts that he earned after the filing of the divorce complaint because, he says, the parties had ceased living together as husband and wife at that time, no attempts at reconciliation had been made, the wife had not contributed to the increase in the value of his assets following the filing of the divorce complaint, and that increase was

14

directly attributable to his sole efforts and should accrue only to him. First, we note that, at the trial on April 17, 2023, when asked whether he was "still living at home with [the wife] in fact after [he] filed for divorce," the husband replied "[f]or a certain period of time, yes," and then replied in the affirmative when asked if that period had been "[f]or at least a couple of months." The wife testified that she and the husband had continued to engage in sexual relations after the husband filed for a divorce and that she had wanted to reconcile with the husband for the best interests of the child until she had learned in mid-December 2024 that the husband had impregnated another woman, which, she said, had prompted her to file her amended answer and counterclaim for a divorce. Both parties testified at the pendente lite hearing and at the trial that, following the filing of the divorce complaint, they had continued to reside in the marital residence until January 10, 2022. We conclude, therefore, that, contrary to the husband's arguments on appeal, there was evidence presented that supports the trial court's finding that the parties had continued to reside together as husband and wife for a period following the filing of the husband's divorce complaint.

To the extent that the husband asserts that the wife should not have received any part of the amounts that the husband had earned following the filing of the divorce complaint because she did not contribute to the increase in the value of assets during that period, we note that the trial court found in the final judgment that the wife had continued to stay at home with the child as his primary caretaker during the period that the parties continued to reside together following the filing of the divorce complaint, as she had before the husband filed his complaint for a divorce. The wife testified at the trial that she had not been employed during the marriage and that she had relied on the husband's income because the parties had agreed for her to stay at home and take care of the child. She stated that she had supported and contributed to the husband's career and that the parties had agreed to invest their income during the marriage to allow them to retire early. The husband presented evidence indicating that the wife had not had any involvement in his businesses after he filed for a divorce. He does not point to any evidence in the record, however, indicating that his increased income after he filed the divorce complaint was not attributable to actions that had been taken before that time. There was evidence from which

16

the trial court could have concluded that the husband's increase in income following the filing of the divorce complaint was the result of the parties having reinvested their income during the marriage rather than the husband's efforts and industry after he filed for a divorce. Additionally, the trial court could have concluded from the evidence presented that the wife had contributed to the husband's ability to earn by continuing to care for the child during the period that they resided together following the filing of the divorce complaint, as she had during the marriage, such that the award of a portion of the husband's earnings during that period to the wife was equitable.

This court is not permitted to reweigh the evidence or to substitute its judgment for that of the trial court. See Robinson v. Robinson, 373 So. 3d 825, 828 (Ala. Civ. App. 2022). Because the trial court's findings are supported by the record on appeal, we cannot conclude that the trial court erred in determining the ending date of the marriage for the purpose of valuing the marital estate for equitable division, and, thus, that portion of the divorce judgment is affirmed.

17

Valuation of the Marital Estate

The husband next argues on appeal that the trial court erred in relying on Husband's Exhibit 5 in paragraph 15 of the final judgment in formulating its property division because, he says, that exhibit was neither credible nor trustworthy. During that portion of the trial on April 17, 2023, dedicated to the wife's December 8, 2022, motion for sanctions, the husband introduced Husband's Exhibit 6, which, he testified, was a personal financial statement that he had provided to River Bank & Trust ("River Bank") on July 1, 2022, and which included a financial statement that he had submitted with a cover letter to River Bank indicating that, after subtracting his total liabilities, his assets totaled $6,889,930 as of May 31, 2022. The husband identified Husband's Exhibit 5 as one of several documents that he had received from the wife as one of her potential exhibits. He testified that the first two pages of that exhibit are the same as the first two pages of Husband's Exhibit 6 but that the financial statement in the wife's exhibit listed the husband's assets, after deducting his total liabilities, as totaling $8,889,930, rather than $6,889,930. The husband testified that he did not know where that

18

financial statement came from but that it had not been produced by River Bank.

The wife testified that, before the husband filed the complaint for a divorce, he had set up an Adobe account for the wife; that, for four or five years preceding the trial, any document that the husband had scanned into the Adobe account was saved into the same folder of scanned documents as those documents scanned by the wife; and that she had located the husband's scanned documents the week before the trial began. According to the wife, among the scanned documents was a personal financial statement that had been signed by the former husband on May 31, 2022, and indicated that his net worth at that time totaled $8,889,930. When asked whether that document bore his signature, the husband responded: "I believe so." When asked whether he had prepared that personal financial statement, the husband answered: "Possibly." And, when asked whether he had scanned that document into the Adobe account, he stated: "Potentially." The husband was subsequently presented with a printed document and asked if he could see from that document that, on May 31, 2022, two documents had been scanned into the Adobe account, both of which were personal financial statements; he

19

answered in the affirmative. He later admitted that he had signed the statement listing his net worth as $8,889,930 and had prepared two personal financial statements on May 31, 2022, but, he stated, "[o]ne was in error."

At the close of the trial on May 2, 2023, the trial court returned its attention to the competing personal financial statements dated May 31, 2022, at which time the husband stated that he had "forgot about two million in debt that he borrowed for the company" at the time he signed the statement indicating that his net worth totaled $8,889,930. There was a brief discussion between the parties' counsel, and, before the discussion transitioned to other issues, the trial court asked: "So we settled on the six million? Is that what you're saying?" At the hearing on the husband's postjudgment motion, the trial court noted that the husband had prepared, signed, and dated the personal financial statement indicating that his net worth totaled $8,889,930; that the corresponding statement from the same date listing his net worth as $6,889,930 that had been submitted to River Bank was not signed; that other personal financial statements that the husband had produced had been standalone documents that were not accompanied by bank

documents like the statement he had signed on May 31, 2022; and that the husband had relied on those statements as representing his net worth at the time those statements were prepared. Those findings support the trial court's reliance on Husband's Exhibit 5, rather than on Husband's Exhibit 6.

The husband argues on appeal that the trial court erred in considering Husband's Exhibit 5 because, he says, the evidence shows that that document contained an error. The husband maintains that the trial court ignored that the husband had introduced that exhibit only to bring to the trial court's attention that the wife's proposed exhibit misrepresented that the statement with the incorrect amount had been submitted to River Bank. We note that the only evidence on which the husband relies to establish that the amount reflected in Husband's Exhibit 5 is an incorrect statement of the husband's net worth is the husband's testimony that the document contains an error. Thus, the husband's argument "is dependent on the credibility of his testimony, which was an issue to be decided by the trial court, not this court." Prakash v. Pandey, 331 So. 3d 1158, 1166 (Ala. Civ. App. 2021). This court has stated that, "in ore tenus proceedings, the trial court has the

advantage of seeing and hearing the witnesses and assessing their demeanor and is in the best position to decide among conflicting testimony which testimony is to be believed." Dubose v. Dubose, 172 So. 3d 233, 245 (Ala. Civ. App. 2014). In the present case, the trial court was not required to accept the husband's explanation for the discrepancy in the two May 2022 personal financial statements reflecting different amounts of the husband's net worth. Prakash, 331 So. 3d at 1166 (holding that trial court was not required to accept husband's explanation for his change in employment resulting in a reduction in his income for purposes of computing child support and alimony). Because the trial court's determination that the husband's net worth as outlined in Husband's Exhibit 5 was reliable and its decision to base its calculation of the property settlement on that amount are supported by the evidence presented, we cannot conclude that those decisions are plainly and palpably wrong. See Stone, supra.

### Property Division

The husband next argues on appeal that the trial court's division and distribution of the marital estate was inequitable. First, he asserts that the trial court failed to consider the illiquidity of the husband's

22

assets and the consequences of its implicit requirement that the husband liquidate those assets to satisfy the property settlement awarded to the wife. He cites in support of his argument Wells v. Wells, 428 So. 2d 88 (Ala. Civ. App. 1983); Robinson v. Robinson, 795 So. 2d 729 (Ala. Civ. App. 2001); Malkove v. Malkove, 349 So. 2d 52 (Ala. Civ. App. 1977); and McCarron v. McCarron, 168 So. 3d 68 (Ala. Civ. App. 2014). The husband cites Wells for the proposition that "the amount awarded one spouse should not cripple the other spouse by requiring the paying spouse to sacrifice his property or business." 428 So. 2d at 90. In that case, the former wife was awarded essentially all the marital property other than a valuable business corporation of which the former husband was the sole owner. Id. at 91. This court affirmed the division of property and the award of alimony in gross in that case after concluding that the trial court could have determined that dividing the business or awarding a larger amount of alimony in gross in a lump sum could have forced a sale of the former husband's business assets, which, we said, would have restricted or prevented him from providing further support to the former wife and the parties' child. Id. at 90-91.

23

In <u>Robinson</u>, the former husband was awarded his business and business equipment while the former wife was awarded the marital residence and surrounding property, her separate business, and other property belonging to the parties, in addition to a portion of the former husband's retirement account. 795 So. 2d at 734. This court acknowledged that the former husband was awarded no assets from which he could pay the property settlement that had been awarded to the former wife other than the remaining portion of his retirement account and that requiring him to use that account to pay the property settlement would require him to incur substantial tax liability, which could virtually negate the award of the account to him and effectively leave him with only his business, which we determined would be inequitable. <u>Id.</u> at 735.

In <u>Malkove</u>, this court rejected the former wife's challenge to that portion of a divorce judgment allowing the former husband to pay his alimony-in-gross obligation to her over a period of more than 10 years because, we said, the argument "assume[d] the existence of a greater sum of liquid assets available for investment than [was] ... present and also ignore[d] the tax consequences likely to result from the sale of assets by the husband." 349 So. 2d at 55. Other than the former husband's interest

in the marital residence and property that was leased by his business, the majority of the former husband's assets consisted of securities. Id. at 53. This court acknowledged that requiring the former husband to sell his business stock or land would have deprived him of his livelihood and that requiring mass liquidation of the former husband's investment properties "might well have resulted in adverse tax and other consequences so as to seriously impair the [former] husband's future earning power and, consequently, his continued ability to meet his periodic alimony and child support obligations." Id. at 55.

In McCarron, this court determined that a judgment of divorce requiring the former husband to pay to the former wife a property settlement in the amount of $400,000 within 30 days of the entry of the judgment for her share of his ownership interest in a closely held family corporation, which both parties had been depending on to support them in their retirement, was due to be reversed. 168 So. 3d at 79-81. We considered the evidence in the record indicating that the parties did not have any liquid assets at the time of the trial, that all of their real property was encumbered by debt, and that the trial court had implicitly acknowledged that the former husband would likely be unable to readily

25

pay that obligation within a 30-day period. Id. at 79-80. Thus, we reversed the judgment and remanded the case for the trial court to determine an appropriate and reasonable installment plan and, acknowledging that the development of such a plan would likely impact the former husband's income with which to pay periodic alimony to the former wife, we directed the trial court to consider the former husband's ability to pay periodic alimony as well. Id. at 81. This court noted that, "[b]ecause of the [former] husband's adultery, the trial court determined that, between the parties, it should be the [former] husband who should endure any diminution in the lifestyle of the parties," but we cautioned that, "even in cases of marital misconduct, the alimony award should not be so oppressive as to leave 'the parties in an unconscionably disparate financial position.'" 168 So. 3d at 81 (citing Shewbart v. Shewbart, 64 So. 3d 1080, 1089 (Ala. Civ. App. 2010)).

In the present case, the husband argues that the trial court's requirement that he pay to the wife $40,248.86 per month for 60 months to satisfy the $2,414,932 property settlement is due to be reversed. He asserts that the trial court determined his monthly income to be $36,800 per month but that his combined monthly obligations for child support,

alimony, noncovered medical and other expenses for the child, and the amount of the property settlement exceed that amount. Contrary to the husband's assertion, the trial court did not make a finding regarding the husband's monthly income in the final judgment. In calculating child support, the trial court made a finding that the parties' combined adjusted gross income exceeded the uppermost limits of the Rule 32, Ala. R. Jud. Admin., child-support guidelines. Although the final judgment and accompanying documents suggest that the trial court employed an income amount for the husband of approximately $36,800 per month in determining the amount of child support to be paid by the husband, the trial court made a finding in its March 28, 2025, postjudgment order amending the divorce judgment that the husband "earns substantial income, whether said income was reported on [the] [h]usband's CS-41 form, or not." The husband's CS-41 income affidavit, which the husband filed on April 14, 2023, indicated that, at that time, he was earning a total monthly gross income in the amount of $37,066, which the husband said was reached using the amount he received in income from his trucking company, NG Whatley Trucking, LLC, of which the husband is the sole owner, and from distributions that he was receiving from BFS Logistics,

LLC, another of the husband's companies,[1] in addition to other employment-related income, distributions, or fringe benefits that were being run through the companies for his benefit, including his vehicle, club memberships, and fuel expenses. We note that the monthly income amount listed by the husband on his CS-41 income affidavit is greater than the amount used by the trial court in determining the amount of child support to be paid by the husband; thus, the trial court clearly concluded that amounts greater than $37,066 were available to the husband as monthly income. That finding is supported by the evidence presented.

For instance, the husband testified that he owns 100% of a company, Rose Holdings, LLC, which he said owns the interest in another company, Equity Pavilion, LLC, which, in turn, receives income from investment properties that generate approximately $14,400 in rental income each month. The husband testified that he had not included

---

[1]The testimony indicates that the husband owns half of a holding company called BFS Holdings, LLC, along with Graham Sutter. William Scott Barranco, the chief financial officer of BFS Holdings, testified that four subcompanies fall under BFS Holdings, including BFS Carriers, LLC; BFS Logistics, LLC; BFS Real Estate, LLC; and BFS Leasing, LLC. When asked if BFS Logistics was his company, the husband answered in the affirmative.

rental income that went to Rose Holdings on his CS-41 income affidavit because, he said, it is "not realized income"; however, when asked whether all the earnings of Rose Holdings flow directly to him, he stated: "Eventually, yes." The wife testified that, during the marriage, the parties spent $15,000 to $20,000 as a family each month and that everything they spent came from Rose Holdings. The husband acknowledged that, in 2022, during the pendency of the divorce action, his bank accounts for Rose Holdings reflected personal expenditures between $22,000 and $25,000 for different four-month periods; he acknowledged that many of those expenditures had been made by his paramour, Brittany Sullivan, with whom he had fathered a child during the pendency of the divorce action.

The husband testified that he receives $5,500 in rental income from JB Hunt Transport, Inc., a larger trucking company in which he owns an interest; that he still owes a debt and pays operating expenses on the property generating that rental income; and that that income also was not included on his CS-41 income affidavit. The wife testified that the husband had told her in June 2021 that his personal income totaled $800,000 per year. Additionally, the wife presented the testimony of

Jason Wells, a certified public accountant, who testified as an expert that documents he had been provided related to the husband's income reflected a net income to the husband in 2022 in the amount of approximately $2.3 million; he stated that that amount did not include all the companies in which the husband has an interest. Although the husband presented the testimony of Charles Eddy, a certified public accountant, who challenged Wells's testimony regarding the husband's income, the trial court could have considered the evidence presented as a whole in concluding that the husband was earning a significant amount of monthly income beyond what he had represented in his CS-41 income affidavit.

Even assuming that the trial court was bound to accept the husband's assertions regarding his monthly income, we note that the husband does not cite any authority indicating that a property settlement is required to be payable from the husband's monthly income. See Rule 28(a)(10), Ala. R. App. P. Indeed, as stated in McCarron, a trial court is charged with equitably dividing marital property and implementing a fair method for distributing the property. 168 So. 3d at 75. The husband argues that the divorce judgment implicitly requires him to liquidate his

30

assets to satisfy the monetary awards to the wife. We acknowledge that, at the December 18, 2023, hearing on the husband's postjudgment motion, the husband's counsel argued that the husband's cash on-hand was limited and that his remaining assets were tied up in the house or in his businesses, to which the trial court responded: "That could be liquidated." The husband argues that the majority of his assets are in the form of business equity; that awarding him his business interests while requiring that he sell them to satisfy the property settlement to the wife negates the award, like in Robinson; that the property division ignores the impairment of his future earning power and his ability to provide support for the wife and the child, as discussed in Wells and Malkove; and that the property division ignores the adverse tax and other consequences the husband will face from a mass liquidation of his business equity.

Contrary to the husband's arguments, however, unlike in Wells or Robinson, in which the payor spouse was not awarded any property other than their businesses from which to pay the lump sums awarded to the payee spouses, the husband in the present case was awarded both the marital residence and a second home located in Santa Rosa Beach,

31

Florida, which, according to the husband, he had purchased in January 2022 for $615,000, using $130,000 that he had removed from other accounts as a down payment, and in which Sullivan resided; when asked whether he was paying all the expenses for that house, the husband replied: "Possibly." The wife testified that the parties had paid $465,000 to purchase the marital residence in February 2021; both parties testified that they had made significant renovations to the residence, and, according to the wife, at the time of the trial on April 19, 2023, the residence was worth at least $700,000, with a mortgage balance in the amount of $397,811.17. Thus, there was evidence presented indicating that the husband had other assets from which he could pay a portion of the amounts awarded to the wife without depriving him of his means of livelihood like in Wells or Malkove.

In Samayamanthula v. Patchipulusu, 338 So. 3d 787, 800 (Ala. Civ. App. 2021), the former husband argued that he had been ordered to pay to the former wife monetary awards that exceeded his available assets, like the husband in the present case. In Samayamanthula, this court rejected the former husband's argument and affirmed the property division based on his failure to account for his lack of credibility at trial,

32

particularly regarding financial matters; the fact that the trial court could have concluded that he had substantial hidden financial assets based on the parties' past incomes and his behavior as to discovery; the former husband's actions related to a rental property owned by the parties, including his having refinanced that property for a greater amount than had been owed on the property at the time and having used the proceeds obtained from the refinancing; and the trial court's consideration of the former husband's financial situation and use of a long-term payment schedule. Id. at 800-01. Like in Samayamanthula, the trial court in the present case concluded that the husband had failed to comply with the wife's discovery requests and with orders entered by the trial court directing him to respond thereto. The trial court specifically made findings in the final judgment that the husband's conduct had been blatant and clearly evidenced his intent to hide or secret his assets from the wife and the court. Throughout the proceedings, the husband answered questions regarding his finances evasively, often responding "possibly," "probably," "potentially," or "could be" to inquiries related to discovery, his business interests, his expenditures, and his financial standing.

33

Additionally, evidence was presented indicating that, during the pendency of the divorce action, the husband had purchased approximately $68,000 of jewelry, the majority of which was for Sullivan and included a $32,000 diamond ring, in addition to other exorbitant purchases he had made for Sullivan. The trial court also noted at the hearing on the husband's postjudgment motion that it had considered the husband's testimony indicating that, although he had neither needed nor employed a consultant before, he had entered into a consulting-services agreement with Sullivan through Rose Holdings, pursuant to which he paid her $2,500 per month, as well as paying an additional $3,000 for a company vehicle and insurance, an employee housing stipend, and company-paid health and dental insurance. The husband acknowledged at the trial that he had withdrawn approximately $70,000 from a personal bank account between the time he had filed for a divorce and March 2022. When asked what he did with that amount of money, he responded: "In my business, people would rather deal in cash when you buy and sell equipment." When questioned whether he would pay those amounts from his personal account and then write them off as business expenses, the husband stated: "I don't recall exactly how I did it." At the

34

hearing on the husband's postjudgment motion, the trial court noted the removal of the $70,000 as well as another $217,000 that the husband acknowledged that he had withdrawn from a brokerage account between October and December 2021 but that the husband could not account for in considering that a lot of money had gone missing during the pendency of the divorce action. Based on the evidence presented regarding the husband's expenditures and cash withdrawals during the pendency of the divorce action, the trial court could have concluded that, like in Samayamanthula, the husband had additional liquid assets from which he could make the monthly payments to satisfy the property settlement to the wife without crippling the husband or requiring him to sacrifice his business holdings, unlike in Wells, Robinson, or Malkove.

To the extent that the husband argues that the property division is not equitable when considering the circumstances presented, we disagree. The husband argues that, in light of the short duration of the parties' marriage, the parties' disparate financial positions before the marriage, the wife's having obtained a college degree, and her ability to earn weigh in favor of allowing the husband to retain a larger share of the marital estate. Regarding the husband's argument that he entered

35

the marriage with a gift of assets and the transfer of a business from his father and brother that entitles him to retain a larger share of the marital estate, we note that the trial court was presented with the wife's testimony indicating that the parties had lived paycheck to paycheck at the outset of the marriage, that the company that had been transferred to the husband from his family had been in debt, and that that company, which was later rebranded as NG Whatley Trucking, had become profitable only during the marriage. Having determined previously that the trial court could have concluded that the wife had contributed to the husband's ability to earn, we decline to further address the husband's argument on this issue. Additionally, despite the evidence indicating that the wife had earned a college degree, the wife also testified that she was employed at the time of trial earning a gross income in the amount of $3,200 per month and that she has certain medical conditions that involve painful sores on her face and scalp, extreme nerve pain, and loss of sensation in her hands and feet that is exacerbated by stress. As discussed above, the trial court was presented with evidence in support of its determination that the husband has the capacity to earn a significant income, particularly in light of the extensive business

36

interests that he was awarded in the final judgment. The trial court noted that it had awarded the husband 73% of the net worth accumulated during the marriage, while awarding the wife only 27%; thus, the husband retained a larger share of the marital estate. Based on the evidence presented, we cannot conclude that the trial court exceeded its discretion in dividing the marital property in this case. See Stone, supra.

### Alimony

The husband next argues that the trial court erred by awarding the wife alimony. First, he asserts that the trial court erred in concluding that the wife's current estate is insufficient to allow her to preserve or to continue in the economic status that she enjoyed during the marriage. Section 30-2-57(b)(1), Ala. Code 1975, directs that a trial court shall award rehabilitative alimony "of an amount to enable the party to acquire the ability to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage." Section 30-2-57(d) provides a list of factors for a trial court to consider in determining whether a party has a sufficient separate estate to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage; those factors include, among others, the party's own individual

37

assets, the marital property received by or awarded to the party, the liabilities of the party following the distribution of the marital property, the party's wage-earning capacity, and any benefits that will assist the party in obtaining and maintaining gainful employment.

As recounted above, the wife testified that, during the marriage, the parties collectively spent $15,000 to $20,000 each month on personal living expenses, excluding amounts for the mortgage or utilities. She stated that the parties had purchased the marital residence for $465,000, including having made a 20% down payment thereon, and that they had immediately begun renovations and had invested $100,000 into the residence before she moved out. The wife testified that her medical issues required her to find a job that was flexible to accommodate the treatment she needed and to allow her to care for the child during her custodial periods. She presented an exhibit reflecting that she has monthly expenses in the amount of $14,000 and testified that she lacks sufficient income to meet those expenses. There is no indication that the wife is capable of earning wages that would allow her to attain or even approach the standard of living that the parties enjoyed during the marriage.

The husband points to the property settlement awarded to the wife in support of his argument that the wife failed to show a need for alimony. We note, however, that, even assuming that the monthly installments of $40,248.86 would permit the wife to eventually obtain and maintain a status similar to that of the parties during the marriage, the extended period over which those payments will be made will not allow her to regain that status immediately. Unlike the husband, who was awarded two separate residential properties, the wife was not awarded a residence. In order for the wife to obtain a residence similar to the marital residence or the Santa Rosa beach house, the wife would be required to use up to five months of her monthly property settlement merely to approximate the amounts spent during the marriage on a down payment for the marital residence and on the renovations that had been performed on that residence at the time of trial. The wife cites Alaudhi v. Davis, 406 So. 3d 860, 873 (Ala. Civ. App. 2024), in which this court, quoting Kean v. Kean, 189 So. 3d 61, 67 (Ala. Civ. App. 2015), acknowledged that we have "held that '[t]he wife should not be compelled to consume the principal of her property-distribution award in order to maintain the lifestyle to which she had become accustomed during the

marriage.'"  In light of the elevated standard of living that the parties came to enjoy during the marriage, the wife's limitations on her ability to earn, and the extended period over which the property settlement is to be paid to the wife, we cannot conclude that the trial court erred in determining that the wife has shown a need for rehabilitative alimony.

The husband also argues that the trial court disregarded the monetary obligations it imposed on him in concluding that he has the ability to pay alimony.  He asserts that the recurring monetary obligations imposed on him by the final judgment, including alimony, child support, payments for the child's medical, dental, and other expenses not covered by insurance, and the property-settlement installments to the wife total at least $48,400.86 per month.  To the extent that the husband argues that those amounts exceed his income, we have concluded both that the trial court could have determined that the husband had ample income from which to make the payments awarded to the wife and that the trial court was not limited to the husband's monthly income as set out on his CS-41 income affidavit in its consideration of his ability to pay the property settlement to the wife.  For

the reasons discussed above, we conclude that the trial court did not err in concluding that the husband has the ability to pay alimony.

The husband next asserts that the trial court disregarded the equities of the case in concluding that the wife is entitled to alimony. He points to the factors to be considered in such an analysis outlined in § 30-2-57(f), including the length of the marriage; the standard of living to which the parties had become accustomed during the marriage; the relative fault of the parties for the breakdown of the marriage; the age and health of the parties; the future employment prospects of the parties; the contribution of one party to the education or earning ability of the other party; the extent to which one party reduced his or her income or career opportunities for the benefit of the other party or the family; excessive or abnormal expenditures and the destruction, concealment, or fraudulent disposition of property; and any other factor the court deems equitable under the circumstances of the case. In light of the considerations discussed above, particularly with regard to the trial court's findings related to the husband's having secreted assets from the court, his heightened earning capacity, and the standard of living to which the parties had become accustomed during the marriage, we

41

cannot conclude that the trial court erred in concluding that the award of rehabilitative alimony to the wife is equitable under the circumstances presented.

### Failure to Tax Costs

The husband last argues that the trial court erred in failing to tax the costs of the appeal in <u>Whatley</u> against the wife. Rule 35(a), Ala. R. App. P., provides, in pertinent part, that, "[e]xcept as otherwise provided by law, … if a judgment is reversed, costs shall be taxed against the appellee unless otherwise ordered...." As stated previously, in our certificate of judgment in <u>Whatley</u>, this court directed that the costs of the appeal were to be taxed against the appellee, i.e., the wife, in accordance with Rule 35. The husband timely filed in the trial court a request to tax the costs of producing the necessary copies of the clerk's record and the reporter's transcript and filed an itemized and verified bill of costs. <u>See</u> Rule 35(c). Those costs, along with this court's docket fee, are all allowable costs pursuant to Rule 35. <u>See</u> <u>Smith v. Player</u>, 630 So. 2d 400, 401 (Ala. 1993). In <u>Ex parte Blue Cross & Blue Shield of Alabama</u>, 473 So. 2d 1045, 1046 (Ala. 1985), our supreme court stated that, "[u]nder Alabama law, if [an appellate] court reverses a trial court's

42

judgment and awards costs to the appellant, the trial judge has no discretion in awarding costs, but, rather, must grant the appellant those costs of appeal that the appellant properly incurred."

The wife argues in her brief on appeal that the same arguments raised in Whatley are back before this court in the present appeal; that the reversal in Whatley was due to an inadvertent oversight by the trial court; that she has demonstrated that the final judgment is due to be affirmed; and that it would be inequitable and unjust for the wife to pay for the prosecution of either appeal. Accordingly, she requests an award of attorney's fees and the costs she has incurred in connection with the entire appellate litigation, including the costs at issue in Whatley. We consider the wife's request for attorney's fees below. Because the wife's argument does not negate the error committed by the trial court in denying the husband's motion to tax costs in accordance with this court's certificate of judgment, we reverse the final judgment insofar as it failed to tax those costs to the wife, see Wehle v. Bradley, 195 So. 3d 928, 947 (Ala. 2015), and we remand the case to the trial court with instructions that it enter an order granting the husband's motion to tax the costs of the appeal in Whatley against the wife.

Appeal No. CL-2025-0151 -- The Modification Action

On February 22, 2024, the husband filed in the trial court a petition to modify his monthly child-support obligation. The wife filed an answer to the husband's petition, denying that the husband was entitled to the requested relief. On June 26, 2024, a trial was conducted. On September 20, 2024, the trial court entered a judgment denying the husband's petition; it found that the husband maintained the ability to pay the monthly child support as previously ordered, that he "remains employed and possesses substantially the same business interests that he previously possessed at the time of the initial order of child support," and that "[h]is employment and ability to earn income at the previous level have not been impaired to a degree which merits a change or reduction in child support." On October 18, 2024, the husband filed a motion to alter, amend, or vacate the trial court's judgment; on January 15, 2025, the trial court entered an order denying that motion. On February 25, 2025, the husband filed his notice of appeal to this court.

Standard of Review

In <u>Corbitt v. Corbitt</u>, 369 So. 3d 1078, 1091 (Ala. Civ. App. 2022),

this court outlined the applicable standard of review:

> "'At the outset, we note that our standard of review in this case is very limited. Alimony, child support, and their subsequent modifications are matters that rest within the trial court's discretion, which will not be disturbed on appeal absent an abuse of discretion that is so unsupported by the evidence as to be plainly and palpably wrong. <u>Brannon v. Brannon</u>, 477 So. 2d 445 (Ala. Civ. App. 1985). A presumption of correctness attaches when the trial court receives <u>ore tenus</u> evidence, and, unless the evidence shows the trial court to be palpably wrong, we must affirm the judgment. <u>Blankenship v. Blankenship</u>, 534 So. 2d 320 (Ala. Civ. App. 1988).'
>
> "<u>Cooper v. Cooper</u>, 550 So. 2d 439, 439-40 (Ala. Civ. App. 1989). A child-support modification is warranted when '"a material change of circumstances that is substantial and continuing"' is shown by the party seeking the modification. <u>Dimoff v. Dimoff</u>, 606 So. 2d 159, 161 (Ala. Civ. App. 1992)(quoting <u>Moore v. Moore</u>, 575 So. 2d 95, 96 (Ala. Civ. App. 1990)). Factors that indicate a change of circumstances include a material change in the needs, conditions, and circumstances of the children. <u>Id.</u>"

Facts

The husband testified that, since the entry of the final judgment,

there had been a drastic decrease in the revenue of his companies and

that NG Whatley Trucking had lost its largest customer in August 2023.

45

He presented exhibits indicating that, in 2022, NG Whatley Trucking had earned revenue in the amount of $2,052,575; that, in 2023, it had earned revenue totaling $1,616,451; and that, from January 1, 2024, through the day before the June 26, 2024, trial date, it had earned total revenue in the amount of $750,646, which, he said, put the company on pace to earn approximately $1,500,000 in 2024. The husband attributed the significant decrease to "the logistics market as a whole." The husband testified that he had attempted to add other customers to mitigate the loss of the company's largest customer, that he had gone to the secondary market to find loads to cover the trucks, and that, in the secondary market, the rates are lower and brokers receive a cut of the freight, but, he said, he had immediately started earning revenue from other markets, with which he had negotiated lower freight rates, when his largest customer had withdrawn. According to the husband, although less money was coming in, his expenses for insurance, fuel costs, and expenses for parts had increased since 2023 and the company was having to pay truck drivers more money to retain them as employees, although he later stated that he had encouraged one employee to take a job elsewhere. Additionally, he stated that he had "tried to pinch pennies

46

here and there," that he had attempted to lease out some of the company's equipment that was not being used, and that he had not filled spots when employees left. The husband testified that he had "had to quit paying [him]self," which he did in November 2023, and that he had had to cover some of the maintenance and insurance costs on his credit card, which, he said, he had paid off with money that he had brought in from BFS Holdings, LLC. See note 1, supra. He testified that he was receiving payments from BFS Logistics every two weeks and a salary from BFS Logistics payroll every two weeks.

The husband stated that BFS Holdings was "hurting as well," that the company had lost half a million dollars in 2024, had laid off employees, had renegotiated rates with vendors, and had gone into default of a loan from First Horizon Bank. He testified that all of his businesses and business assets, including the holdings of Rose Holdings, NG Whatley Trucking, and Whatley Leasing, LLC, which owns the trucks and equipment that NG Whatley Trucking operates, serve as collateral for BFS Holdings' loans from First Horizon Bank. Additionally, he stated that he had signed a personal guaranty on the loan. According to the husband, he does not receive direct income from Rose Holdings,

which owns income-generating real estate, because the income received by that business pays for other business expenses, including maintenance, yard upkeep, pest service, and property taxes. The husband testified that he had outstanding debts of over $50,000 for NG Whatley Trucking and Whatley Leasing and that he had put as much as possible on his credit card to repay those amounts. William Scott Barranco, the chief financial officer of BFS Holdings, testified that the current status of the trucking industry was "not good," that there had been too much capacity in the marketplace, that rates and volume had dropped, and that "[i]t's more or less a trucking recession." He stated that BFS Holdings had cut payroll and had "laid off a couple of people," that the company was "on pace to lose probably $1 million" in 2024, and that it was "[n]ot profitable."

The husband acknowledged that, as the sole owner of NG Whatley Trucking, he determines what to pay himself. He admitted that, in October 2023, he had paid $45,480.38 to join a new country club and that he pays monthly dues to that country club in the amount of $1,073. He also admitted that he had paid $57,487 to another country club since the entry of the final judgment and that he is also a member of a third

48

country club. The husband testified that he is a member of the country clubs for networking purposes and to meet other businessmen to drum up business for his company. The wife presented as an exhibit a Schedule K-1 tax form for 2022 indicating that the husband had received net income in the amount of $423,070 that year from Equity Pavilion, LLC, and that Rose Holdings had received net income in the amount of $231,930 from Equity Pavilion II, LLC. The husband testified, however, that he had stopped receiving monthly income from Equity Pavilion at the beginning of 2023 because it "sold." The wife also presented as an exhibit account statements from River Bank for NG Whatley Trucking, which indicate that BFS Carriers, LLC, pays to NG Whatley Trucking's account multiple amounts for "payroll" and an additional $8,000 per month for "BFS Carriers Corp Pay."

The husband denied that he receives distributions from BFS Holdings or from BFS Carriers and testified that he had not filed personal income-tax returns for the years 2022 or 2023. The husband acknowledged that Sullivan has an authorized card on his American Express credit-card account; when asked if she makes expenditures on that card every month, he stated: "Possibly." He also testified that he

pays the balance on that credit card every month "[f]or the most part." The wife presented as an exhibit the husband's personal bank statements from River Bank, which indicate that the husband had made payments to American Express in January 2024 totaling $43,963.90 and payments totaling $17,493.17 in March 2024. The husband testified that he pays for the child's tuition and his child-support payments on his American Express card and that there are a lot of business expenses included in those amounts; the trial court noted that statements from that account were not presented. The wife also presented as an exhibit statements from CCB Bank for an account in the name of Rose Holdings, of which the husband is the sole owner. The husband acknowledged that those statements indicated the receipt of monthly rental income from JB Hunt Transport in the amount of $5,525.17 and from Equity Student Troy, LLC, in the amount of $833.33. He acknowledged that expenditures from the CCB Bank account included payments to country clubs and to Banana Republic, a retail clothing store, which expense he stated could have "[p]ossibly" included clothing he had purchased for the child and for his other child with Sullivan.

Discussion

The husband argues that the trial court erred by failing to modify his child-support obligation in accordance with Rule 32, Ala. R. Jud. Admin. Rule 32(A)(3) addresses child-support modifications and provides, in pertinent part:

> "(b) A party seeking a modification of child support must plead and prove that there has occurred a material change in circumstances that is substantial and continuing since the last order of child support.
>
> "(c) There shall be a rebuttable presumption that child support should be modified when the difference between the existing child-support order and the amount determined by application of these guidelines varies more than ten percent (10%), unless the variation is due to the fact that the existing child-support order resulted from a rebuttal of the guidelines and there has been no change in the circumstances that resulted in the rebuttal of the guidelines.
>
> "(d) The existence of the guidelines or periodic changes to the guidelines in and of themselves do not constitute proof of a material change in circumstances that is substantial and continuing.
>
> "(e) A trial court has discretion and authority to modify a child-support obligation even when there is not a ten percent (10%) variation between the current obligation and the guidelines when a petitioner has proven a material change in circumstances that is substantial and continuing. Likewise, a trial court has discretion to deny a modification even when the ten percent (10%) variation is present, based on a finding that the application of the guidelines in that case would be manifestly unjust or inequitable."

The husband first argues on appeal that the trial court erred by failing to apply the rebuttable presumption in favor of a modification outlined in Rule 32(A)(3)(c) because, he says, the difference between his child-support obligation at the time of the divorce trial and the new recommended order exceeded 10%. He asserts that his existing child-support obligation did not result from a rebuttal of the guidelines such that he was required to show a change in the circumstances that had resulted in that rebuttal because, according to Batain v. Batain, 912 So. 2d 283, 285 n.2 (Ala. Civ. App. 2005), and Floyd v. Abercrombie, 816 So. 3d 1051, 1057 (Ala. Civ. App. 2001), if the parties' combined adjusted gross monthly income exceeds the uppermost limit of the guidelines, a determination of child support is removed from and would not be governed by the guidelines. The husband argues also that the trial court erred by failing to determine that a significant decrease in his income constitutes a material change in circumstances that warrants a modification of his child-support obligation and that the trial court erred in implicitly concluding that the husband is underemployed and by failing to disclose the amount of income, if any, that it imputed to him.

52

We note that the husband's arguments rely heavily on the evidence presented by the husband in support of his assertion that, since the entry of the final judgment, his income had decreased to such a degree that the amount of child support determined by application of the guidelines would require application of the rebuttable presumption in Rule 32(A)(3)(c). The trial court noted, however, at the hearing on the husband's postjudgment motion, that it was not required to accept the husband's assertions regarding his decreased income. The trial court is correct that it "'is not bound by the income figures advanced by the parties, and it has discretion in determining a parent's gross income.'" Walker v. Lanier, 221 So. 3d 470, 473 (Ala. Civ. App. 2016) (quoting Morgan v. Morgan, 183 So. 3d 945, 961 (Ala. Civ. App. 2014)).

In cases in which a parent is self-employed, like the husband in this case, Rule 32(B) defines income to include gross receipts minus ordinary and necessary expenses for income from self-employment, rent, royalties, proprietorship of business, or joint ownership of a partnership or closely held corporation; it also includes expense reimbursements or in-kind payments received by a parent in the course of self-employment or the operation of a business that are significant and reduce personal-living

expenses. Thus, the trial court was not limited to considering representations by the husband regarding the amount of income he chose to receive as a salary from his businesses. Rather, the trial court concluded that the husband's business interests remained approximately the same as they had at the time the final judgment was entered. That determination is supported by the evidence presented. In addition to the amounts the husband testified that he received from payroll and distributions from BFS Logistics, the trial court was presented with evidence of amounts received by NG Whatley Trucking and Rose Holdings, both of which are solely owned by the husband, in addition to amounts expended on behalf of the husband from the accounts for those businesses. The trial court acknowledged the husband's testimony indicating that NG Whatley Trucking was on schedule to approximate a similar amount of revenue as it had earned in the previous year. Although the husband testified that certain of his expenses for NG Whatley Trucking had increased, there was also evidence indicating that that company had lost employees and that the husband had made other efforts to mitigate the loss in revenue. Based on the evidence presented, we cannot conclude that the trial court erred in determining that the

husband's business interests had not changed significantly since the entry of the final judgment and that his self-employment income had not decreased in an amount that requires the application of the rebuttable presumption in Rule 32(A)(3)(c).

Although the husband acknowledged that NG Whatley Trucking had lost its biggest customer around the time the final judgment was entered and that much of the revenue earned by the company in 2023 had been from that customer, he also stated that he had immediately made efforts to fill in the gaps resulting from that loss and had begun collecting revenue from those efforts such that NG Whatley Trucking was on pace to approximate the same amount of revenue in 2024. Moreover, the husband testified that, after the loss of that customer, he had joined another country club, in addition to the two of which he was already a member, for the purpose of drumming up new business. Thus, the trial court could have considered that evidence in concluding that the husband had not shown that any change of circumstances was "substantial and continuing." See Rule 32(A)(b) & (e), and Corbitt, supra.

The husband's argument that the trial court's finding that his employment and ability to earn income at the previous level had not been

impaired is tantamount to a finding that he is voluntarily underemployed and requires reversal is similarly without merit. The husband cites in support of his argument Kwasigroh v. Kwasigroh, 209 So. 3d 520, 527-28 (Ala. Civ. App. 2016), in which this court concluded that a finding that the father in that case was voluntarily underemployed was supported by the evidence but noted that there were no findings imputing income to the father or specifying the amount of income that was imputed to him to calculate child support pursuant to the guidelines based on that amount of income in accordance with Rule 32(B)(5). Unlike in Kwasigroh and other cases cited by the husband on appeal, however, the trial court determined the husband's child-support obligation in the final judgment based on its finding that the parties' income exceeded the uppermost limits of the child-support guidelines. The trial court clarified at the hearing on the husband's postjudgment motion in the modification action that it had determined that the husband's income continued to exceed the uppermost limits of the child-support guidelines. Thus, as argued by the husband, a calculation of the amount owed pursuant to the guidelines

is not required under the circumstances presented herein.[2]  See Batain

and Floyd, supra.  Accordingly, we decline to reverse the trial court's

judgment on that basis.

## Conclusion

In appeal number CL-2025-0271, we reverse the final judgment

with regard to its failure to tax the costs of the appeal in Whatley against

the wife, and we remand the case for the entry of a judgment consistent

with this court's opinion on that issue.  We affirm the final judgment in

all other respects.  In appeal number CL-2025-0151, we affirm the trial

court's judgment in the modification in its entirety.

---

[2]We note that the most recent amendment to Rule 32 includes a revised Schedule of Basic Child-Support Obligations that includes combined-adjusted-gross-income amounts ranging from $0 to $30,000 per month, but the version of Rule 32 in effect at the time of the entry of the final judgment addressed only combined-adjusted-gross-income amounts up to $20,000.  See Committee Comments to Amendments to Rule 32 Effective May 1, 2022.  As discussed earlier in this opinion, the trial court considered the parties' combined adjusted gross income at the time of the entry of the final judgment to have exceeded the uppermost limits of the guidelines, both as of the time of the entry of the divorce judgment and as amended.  Thus, the trial court's conclusion that the husband continued to be capable of earning income at the previous level supports the trial court's statement at the postjudgment hearing that the parties' combined monthly income continued to exceed the uppermost limit of the guidelines at the time the judgment in the modification action was entered.

The wife's request for an award of attorney's fees on appeal is granted in part; the court awards the wife $10,000.

CL-2025-0151 -- AFFIRMED.

CL-2025-0271 -- AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Edwards, Hanson, Fridy, and Bowden, JJ., concur.